[No. C052849. Third Dist. Oct. 22, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ELIJAH QUINCEY THOMAS, Defendant and Appellant.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III of the Discussion.

## COUNSEL

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HULL, J.**—After entering pleas of not guilty and not guilty by reason of insanity, defendant Elijah Quincey Thomas was convicted by a jury of rape (Pen. Code, § 261, subd. (a)(2); unspecified section references that follow are to the Penal Code), kidnapping to commit rape (§ 209, subd. (b)(1)), and two counts of robbery (§ 211). In the sanity phase of the proceedings, the jury found defendant sane at the time of the offenses. Sentenced under the three strikes law to an aggregate determinate term of 34 years plus an indeterminate term of 50 years to life, defendant appeals claiming various instructional errors during the sanity phase. We find no error and affirm the judgment.

### Facts and Proceedings

At approximately 4:00 or 4:30 a.m. on December 19, 2001, 14-year-old Roberta C. left her cousin's apartment on Riza Avenue in Sacramento to walk home. She headed down Stockton Boulevard for a while but then decided it was too late and too far to go and turned around to retrace her steps.

On the way back, Roberta saw defendant coming from a motel. She started walking faster, and defendant followed suit. Roberta began running, and defendant yelled at her to stop. Defendant caught up with her just as she reached her cousin's apartment complex.

Defendant told Roberta to "[d]rop and show me what you got." Defendant had his hand in his jacket pocket as if he had a gun pointed at her. She told defendant, "no." Defendant told Roberta to give him her purse, and she complied. Defendant went through the purse and told Roberta that if she tried to scream or run he would "blast" her. Defendant directed her to the corner of an empty lot near a garbage can and a fence.

Defendant began touching Roberta's buttocks and breasts. Defendant threatened to shoot her and pulled down her pants. Defendant pulled his own pants down and directed Roberta to bend over. He tried to insert his penis in her vagina but was unable to do so. He then directed Roberta onto her hands and knees and again was unsuccessful in penetrating her vagina. Finally, defendant directed Roberta onto her back and was able to penetrate her vagina with his penis.

Afterward, defendant and Roberta returned to the apartment complex and defendant directed her to take him to her cousin's apartment. When they arrived, Roberta opened the door and ran inside. She went to a back room and told her cousin and her cousin's boyfriend, Raymond J., that a man was inside with a gun. Defendant appeared in the doorway of the room, pulled a

revolver from his pocket and demanded money. Defendant took Raymond's necklaces, pants, wallet and car keys.

Roberta later reported the rape to police and underwent a sexual assault examination. Samples were taken for DNA analysis. Later, a DNA match was made with a sample taken from defendant.

Defendant was charged with rape (§ 261, subd. (a)(2)), kidnapping (§ 209, subd. (b)(1)), and two counts of robbery (§ 211). On August 26, 2004, defendant was found incompetent to stand trial and was committed to Atascadero State Hospital.

On March 18, 2005, the trial court determined defendant's competence had been restored and criminal proceedings were reinstated. Defendant was arraigned and entered pleas of not guilty and not guilty by reason of insanity.

The guilt and sanity phases were bifurcated, and defendant was tried on the substantive offenses first. The jury convicted him on all four counts. The jury found defendant had been armed at the time of the rape (§ 12022.3, subd. (b)) and had kidnapped the victim for purposes of committing the rape (§§ 667.8, subd. (a), 667.61, subds. (d)(2), (e)(1)). The jury also found defendant had used a firearm in connection with one of the robberies. (§ 12022.53, subd. (b).) Finally, the court found defendant had suffered a prior serious felony conviction for assault with a deadly weapon (§ 245, subd. (a)(1)).

In the sanity phase, the jury found defendant was sane at the time of the offenses.

Defendant was sentenced to an aggregate, determinate term of 34 years, plus an indeterminate term of 50 years to life, as follows. On count one, the rape charge, defendant received an indeterminate term of 25 years to life, doubled to 50 years to life under the three strikes law, plus enhancements of two years for being armed and five years for the prior serious felony conviction. On count two, the kidnapping to commit rape charge, defendant received an indeterminate term of 50 years to life that was stayed pursuant to section 654. On count three, the robbery of Raymond J., defendant received a consecutive, upper term of five years, doubled to 10, plus an enhancement of 10 years for use of a firearm. Finally, on count four, the robbery of Roberta C., defendant received a one-third middle term of one year, doubled to two, plus an enhancement of five years for the prior serious felony conviction.

### Discussion

### I

### *CALCRIM No. 3450*

During the sanity phase, the jury was instructed pursuant to Judicial Council of California Criminal Jury Instructions (2005) CALCRIM No. 3450 as follows:

"You have found the defendant guilty of the crimes charged. You must—now you must decide whether he was legally insane when he committed the crimes.

"The defendant must prove that it is more likely than not he was legally insane when he committed the crime.

"The defendant was legally insane if, one, when he committed the crime he had a mental disease or defect and, two, because of that disease or defect he did not know or understand the nature and quality of his act or did not know or understand that his action was morally or legally wrong.

"None of the following qualifies as a mental disease or defect for purposes of an insanity defense, personality disorder, an adjustment disorder, seizure disorder or an abnormality of personality or character made apparent only by a series of criminal or anti-social acts.

"If the defendant suffered from a settled mental disease or defect caused by long term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity.

"A settled mental disease or defect is one that remains after the effects of the drugs or intoxicants has worn off.

"You may consider any evidence that the defendant had a mental disease or defect before the commission of the crime. If you are satisfied that he had a mental disease or defect before he committed [the] crime, you may conclude that he suffered from the—that same condition when he committed the crime.

"You must still decide whether the mental disease or defect constitutes legal insanity.

"If you find that the defendant was legally insane at the time of this crime, he will not be released from custody until a court finds he qualifies for release under California law.

"Until that time he will remain in a mental hospital or out-patient treatment program if appropriate. He may not generally be kept in a mental hospital or out-patient program longer than the maximum sentence available for his crime.

"If the state requests additional confinement beyond the maximum sentence, the defendant will be entitled to [a] new sanity trial before a new jury.

"Your job is only to decide whether the defendant was legally sane or insane at the time of the crime.

"You must not speculate as to whether he is currently sane or may be found sane in the future. You must not let any consideration about whether the defendant may be confined or for how long affect your decision in any way.

*"If you conclude that at times the defendant was legally sane and other times the defendant was insane, you must assume that he was legally sane when he committed the crime.*

"If you conclude that the defendant was legally sane at the time he committed the crimes, then it is no defense that he committed the crimes as a result of uncontrollable or irresistible impulse.

"If after considering all the evidence all twelve of you conclude that the defendant has proved that it is more likely than not that he was legally insane when he committed the crimes, you must return a verdict of not guilty by reason of insanity." (Italics added.)

Defendant contends that, because virtually all mentally ill persons have lucid moments, the italicized portion of this instruction effectively directed a finding of sanity. According to defendant, the instruction "require[d] [the] jury to find [him] sane even though he might have been insane at the time of the crime if at any other time he was sane." Defendant further argues a directed verdict was inappropriate, because he presented sufficient evidence of insanity to go to the jury.

The People counter that the italicized portion of the instruction is legally accurate and informs the jury that if there were times when defendant was legally sane and other times when he was legally insane, "it is assumed that he was legally sane when he committed the crimes." According to the People, this is because "defendant will not have met the burden of demonstrating it is more likely than not he was legally insane *when he committed the crime*."

We fail to follow the People's logic. If the evidence shows that, in the past, there were times when defendant was sane and other times when he was insane, this does not necessarily mean defendant failed to prove he was insane at the time of the offenses. If defendant's history contains periods of sanity and periods of insanity, defendant will nevertheless have met his burden if he proves the offenses were committed during one of the periods of insanity.

When viewed in isolation, we agree with defendant the highlighted portion of the instruction could be misleading. The point of the instruction is to inform the jury the burden is on the defendant to prove he was insane at the time of the offenses. This does not change after evidence has been presented that the defendant was sane or insane at different times, including the time of the offenses. Therefore, no good can come from informing the jury that, once evidence has been presented that the defendant was sane at times and insane at other times, it must assume he was sane at the time of the offenses. This assumption existed before evidence was presented. Thus, there is the risk the jury might read the highlighted portion to mean the assumption is irrebuttable.

Nevertheless, when the instruction is viewed as a whole, we do not find a reasonable juror would have been misled.

■ "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538–539 [224 Cal.Rptr. 112, 714 P.2d 1251]; see also *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [74 Cal.Rptr.2d 212, 954 P.2d 475].) In evaluating a claim that the jury could have misconstrued an instruction, the test on review is " ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*People v. Raley* (1992) 2 Cal.4th 870, 901 [8 Cal.Rptr.2d 678, 830 P.2d 712], quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 399, 112 S.Ct. 475].)

■ As indicated, the thrust of CALCRIM No. 3450 is to inform the jury that the burden is on the defendant to prove he was insane at the time of the offenses. This is consistent with section 25, subdivision (b). The instruction states that if the jury determines the defendant had a mental disease or defect at any time before he committed the offenses, the jury may conclude that same condition existed at the time of the offenses. It concludes by stating that, if the jury decides the defendant proved it is more likely than not he was insane at the time of the offenses, the jury must return a verdict of not guilty by reason of insanity. Thus, even if the jury was directed to "assume" the

defendant was sane, this assumption is subject to defendant presenting evidence to prove otherwise. An assumption of sanity, like an assumption of innocence, is just another way of saying the burden is on the party claiming otherwise to prove it.

II, III[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**DISPOSITION**

The judgment is affirmed.

Davis, Acting P. J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 13, 2008, S158502. Kennard, J., Baxter, J., and Chin, J., were of the opinion that the petition should be granted.

---

[*]See footnote, *ante*, page 304.