Filed 3/29/13  P. v. White CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MIGUEL WHITE,<br><br>  Defendant and Appellant. | C069249<br><br>(Super. Ct. No. 09F01087) |

Defendant Miguel White and an accomplice robbed three pizza delivery men at gunpoint.  During the third robbery, defendant shot the delivery man in the leg. Following a jury trial, he was convicted of three counts of second degree robbery (Pen. Code, § 211)[1] and one count of attempted carjacking (§§ 664/215, subd. (a)). Additionally, the jury found true three enhancements for personal use of a firearm

---

[1] Undesignated statutory references are to the Penal Code.

1

(§ 12022.53, subd. (b)) and an enhancement for personal and intentional discharge of a firearm causing great bodily injury (§ 12022.53, subds. (c), (d)). The trial court sentenced defendant to state prison for 18 years four months plus 25 years to life.

On appeal, defendant contends (1) there is insufficient evidence to support the personal and intentional discharge of a firearm enhancement, (2) instructional error on that enhancement, and (3) trial counsel was ineffective for failing to request an instruction on accident. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2009, defendant lived in an apartment with Willie Soders, Latisha Watkins, and Sarina Lockhart. Defendant and Watkins were in a relationship, as were Soders and Lockhart. Soders's hair was styled in dreadlocks or "twisties" at the time, while defendant had a short haircut.

### Pizza Guys Delivery Robbery

On January 20, 2009, defendant had Lockhart call in an order with Pizza Guys for delivery to an address other than their apartment. Defendant and Soders donned hooded sweatshirts and left the apartment 20 to 30 minutes later. They returned to the apartment with pizza and $90 cash.

Oleksander Melynk delivered the pizza order. Two men approached Melynk, one of whom was armed. The armed man pointed a shotgun at Melynk and said, "give me the money." Melynk handed over $100 cash, and the robbers fled with the pizza and the money.

### Round Table Pizza Delivery Robbery

On January 22, 2009, Lockhart, at defendant's request, called in a delivery order to Round Table Pizza. Defendant and Soders donned hooded sweatshirts after the order was placed.

Joaquin Perez delivered the order to the address given by Lockhart, but the family residing there told him they had not ordered any food. Perez called the

2

phone number on the receipt, and a male voice confirmed the order. There was laughing in the background, so Perez tried to verify the address, but the man hung up. Perez then called his supervisor, who called the number to verify the address. After getting the same treatment as Perez, the supervisor told Perez to return to the restaurant with the pizza order.

Later, Perez received a call from a male at the same number asking for the pizza. The caller, defendant, said he would have someone outside waiting for the order to arrive. Perez's supervisor authorized a delivery, and Perez drove to the address given in the call. As Perez drove up, he saw a "like a younger kid" with "dreaded" or "twisted" hair standing by the curb opposite from the delivery address. After Perez unloaded the food, he was approached by a different man; this man was carrying a shotgun. The gunman demanded money and Perez gave him $20 in one dollar bills. The gunman then demanded Perez's cell phone and Perez reluctantly gave it to him. Perez asked why they were doing this since they would only get a small amount. He then asked for his cell phone back and the gunman asked Perez if he wanted the phone back because he was planning on calling the police. Perez said, "no[,] never mind" and was then "sucker-punched" in the face by the unarmed man with the dreadlocks or twisties. The gunman asked for Perez's Bluetooth earpiece, but Perez said it fell out of his ear when he was hit. He explained it was somewhere on the ground. The robbers fled without taking the food.

Defendant and Soders returned to the apartment with $20 and no food. Lockhart asked Soders where the pizza was; Soders replied it was none of her business. Lockhart later saw Soders reenact hitting a person.

### Domino's Delivery

On January 23, 2009, Lockhart refused defendant's request to call in a pizza order to Domino's, as she now suspected it was a pretense to robbery. Soders choked Lockhart, and someone else placed the order. Defendant and Soders dressed in hooded sweatshirts and left the apartment.

3

John Martinez delivered the pizza order. The house was "kind of dark" when Martinez arrived. He backed the car into the driveway and started unloading the pizzas. When he turned around, two men were standing in front of him. One of the men, defendant, held a shotgun.

Defendant told Martinez to "give me everything." Martinez put down the pizza, took out his wallet, and pulled out $20. The unarmed man then searched Martinez's pockets and, after finding another $20, held it up for defendant to see. Defendant then asked Martinez for his keys and cell phone; Martinez gestured toward his car by moving his head.

Martinez decided to leave after it became quiet for a moment. Martinez took a step backward toward his car door, and defendant leaned forward and shot Martinez in the leg. Martinez turned around, saw a "huge hole" in his leg, and the two robbers slowly jogging from the scene. The robbers left the pizza. Martinez thought he had been shot to keep him from pursuing the robbers.

Defendant and Soders were out of breath and looked worried when they returned to the apartment. Lockhart asked if something was wrong, and defendant said, "[s]omeone got hurt."

Sometime thereafter, defendant and Watkins got into an argument and defendant moved out of the apartment. According to Lockhart, defendant took a shotgun wrapped in a shirt with him when he left.

### Investigation, Arrest and Defendant's Admissions

Police determined the phone number used to order the pizza on all three occasions belonged to Soders. Soders, who was on probation, was arrested with the cell phone in his possession. It had been used to call each pizzeria on the night their delivery man was robbed. The phone contained a photograph of defendant holding a shotgun.

When he was arrested, defendant tried to evade the police by exiting a fourth floor apartment balcony and climbing along a three-inch ledge to the balcony of an adjacent

4

apartment, where he was found. In an interview with the police, defendant admitted that he was the person holding the shotgun in the photograph on Soders's phone.

Defendant initially claimed he knew about only one of the robberies. Later, he admitted participating in the second robbery, and explained that the first robbery was "easy." He also admitted participating in the third robbery.

Defendant knew Martinez, the victim of the third robbery, was lying when he said that he had only $20. When Soders demanded the car, Martinez refused and took a step toward them. Defendant and Soders told Martinez to stop. When Martinez "tried to pull a move," defendant jumped back, and the shotgun accidentally discharged. Defendant said, "we didn't know that the gun was loaded." Defendant did not provide this accidental discharge scenario until after the detective who was interrogating defendant suggested the shooting was accidental as an interrogation technique.

## DISCUSSION

### I. Sufficiency of the Evidence

Defendant contends there is insufficient evidence to support the true finding for intentional and personal discharge of a firearm resulting in great bodily injury (§ 12022.53, subd. (d)) in count three, the robbery of John Martinez. We disagree.

Section 12022.53, subdivision (d), states in pertinent part: ". . . any person who, in the commission of a felony specified in subdivision (a), . . . personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7 . . . to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." Robbery is one of the felonies enumerated in subdivision (a) of section 12022.53. (§ 12022.53, subd. (a)(4).)

The test for sufficiency of the evidence to support an enhancement is whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the elements of the enhancement beyond a reasonable doubt.

5

(*People v. Alvarez* (1996) 14 Cal.4th 155, 225.) Defendant argues there is insufficient evidence that he intentionally discharged the shotgun. He claims the evidence shows he shot Martinez accidentally rather than intentionally. Noting the jury could not reach a verdict in an attempted murder count stemming from the assault,[2] defendant asks us to reverse the true finding.

The cases cited by defendant do not support his contention. He relies on a passage from *People v. Silbertson* (1985) 41 Cal.3d 296. But the passage he cites is part of a discussion finding failure to instruct on intent to kill (an element of the felony murder special circumstance at the time) in which the court determined the failure was not harmless in light of evidence negating defendant's intent to kill. (*Id.* at pp. 304, 306-307 & fn. 13.) *Silbertson* is irrelevant to defendant's contention.

This court's decision in *People v. Treadway* (2010) 182 Cal.App.4th 562 is likewise inapposite. *Treadway* involved a mentally disabled defendant who shot the victim purportedly after the victim threw his lunch bag at the defendant and charged him in an attempt to obtain the defendant's gun. (*Id*. at p. 565.) The issue this court decided in *Treadway* was whether the prosecution's plea agreement barring the codefendants from testifying at defendant's trial violated defendant's right to compulsory process and due process. (*Id.* at p. 567.)

In *People v. Jones* (1991) 234 Cal.App.3d 1303, the Court of Appeal held the trial court's failure to give a sua sponte instruction on the defense of accident was harmless error. (*Id*. at p. 1314.) That ruling is not relevant as to whether substantial evidence supports the true finding on the enhancement here, and the holding that a trial court has a duty to instruct sua sponte on accident has since been disapproved. (*People v. Anderson* (2011) 51 Cal.4th 989, 998, fn. 3.)

---

[2] The jury deadlocked at 10 to two on the attempted murder charge in count five and the trial court declared a mistrial as to that charge.

The evidence here shows that defendant and Soders responded with force if their victims showed any independence. When the victim of the Round Table robbery questioned the wisdom of robbing him for such a small amount of money and asked defendant to return his cell phone, Soders struck him in the face. The victim of the shooting, Martinez, initially did not give the robbers all of his money, and unsuccessfully tried to keep $20. He was shot as he took a step backward in an effort to leave the scene before defendant and Soders made their escape.

According to Martinez's testimony, defendant held the shotgun at shoulder level and pointed it at Martinez throughout the robbery. Martinez was standing at the rear driver's side of his car, while defendant was "on the sidewalk, like maybe a little bit up on the driveway." After it became silent for a moment, Martinez took a step back to get into his car. He was then shot in the leg, "in the perfect spot, just like to cripple me." Martinez did not see the gun when he was shot, but testified that defendant "lean[ed] forward and shot." Martinez saw the muzzle flash. Defendant was four or five feet from Martinez when the shotgun was discharged.

The evidence supports an inference that defendant intentionally shot Martinez in the leg to prevent him from leaving the scene. Defendant, who had been pointing the shotgun at Martinez, leaned forward as he shot Martinez, indicating the shot was aimed and therefore intentional. Shooting Martinez in the leg accomplished the task of allowing defendant and Soders to escape the scene. In short, the true finding on the enhancement is supported by substantial evidence.

## II. Asserted Instructional Error

Defendant contends the trial court committed prejudicial error by instructing the jury that the intentional discharge of a firearm enhancement (§ 12022.53, subd. (d)) is a general intent allegation. He is mistaken.

During deliberations, the jury asked the trial court: "Definition of the legal term intent per the first special finding in Count Five. . . . As written in PC 12022.53(b),

7

page 39, and section 12022.53(d), page 40, and violation of section 664 dash 184 subsection A, page 38." The question refers to the firearm allegations and the attempted murder charge in count five.

The trial court told the jury that attempted murder was a specific intent crime that required an intent to kill and that the personal use enhancement was a general intent allegation that required an intent to do one of the proscribed acts. Regarding the intentional discharge allegation, the trial court stated: "this is a general intent allegation. . . . [¶] . . . [¶] . . . For you to find this allegation true, that person must not only commit the prohibited act, but must do so with wrongful intent, to wit, that: 'the defendant intended to discharge the firearm.' A person acts with wrongful intent when he or she intentionally does a prohibited act, however, it is not required that he or she intend to break the law. [¶] For each crime and allegation, each of the elements for that crime and allegation must be proven beyond a reasonable doubt by the Prosecution." Defendant objected to the use of general intent in defining the intentional discharge allegation, asserting that the enhancement requires a "specific intent" to discharge the firearm.

Defendant contends on appeal the court's answer regarding general intent was incorrect and confused the jury. Noting that the distinction between general and specific intent can be confusing (see *People v. Hood* (1969) 1 Cal.3d 444, 456 ["Specific and general intent have been notoriously difficult terms to define and apply"]), defendant asserts that the trial court's response "merely begs the jury's question" as to whether defendant specifically intended to fire the shotgun as opposed to doing so by accident or negligence.

We must review jury instructions based on how a reasonable juror would construe them. (*People v. Clair* (1992) 2 Cal.4th 629, 688.) The ultimate test on appeal is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution. [Citation.]" (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385].) We do not review fragments of

8

instructions divorced from the entire instruction; nor can we review an instruction isolated from the complete charge to the jury. (*People v. Thomas* (2007) 156 Cal.App.4th 304, 310.)

Here, the trial court's instruction was proper. *People v. Wardell* (2008) 162 Cal.App.4th 1484, a case not cited by either party, is relevant to this issue. In *Wardell*, the court held that the enhancement in section 12022.5, subdivision (a) for personal use of a firearm requires a general intent, not a specific intent. The court noted, " ' "When the definition of a crime [or enhancement] consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime [or enhancement] is deemed to be one of specific intent.' " [Citation.] [¶] The definition of personal use of a firearm consists of a description only of the proscribed act -- 'personal[] use[] [of] a firearm in the commission of a felony or attempted felony.' (Pen. Code, § 12022.5, subd. (a).) No intent to 'do some further act or achieve some additional consequence' is part of the statutory definition." (*Wardell*, *supra*, 162 Cal.App.4th at p. 1494.)[3] And as our high court has recognized, when the Legislature intends to require proof of a specific intent in an enhancement provision, it has done so explicitly by referring to the required specific intent in the statute. (*In re Tameka C.* (2000) 22 Cal.4th 190, 199; see, e.g., former § 12022.7, subd. (a), as amended by Stats. 1994, ch. 873, § 3 [former great bodily injury enhancement in

_____

[3] This explanation of general and specific intent criminal provisions is found in cases the parties do discuss. (*People v. Davis* (1995) 10 Cal.4th 463, 518-519, fn. 15; *People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1166-1167 [great bodily injury enhancement required general intent, not specific intent].) This well-settled rule has its origin in *People v. Hood* (1969) 1 Cal.3d 444, 456-457.

9

§ 12022.7 which read, "[a]ny person who, with the intent to inflict the injury, personally inflicts great bodily injury," required a specific intent to cause great bodily injury].)

Here, the enhancement in section 12022.53, subdivision (d) consists of a description only of the proscribed act -- personal and intentional discharge of the firearm, i.e., the defendant intended to pull the trigger. It does not require that a defendant intend to pull the trigger with the intent to do some further act or accomplish some other goal.[4] Thus, the enhancement calls for general criminal intent.

Defendant insists the trial court should have told the jury the enhancement requires that a defendant *specifically* intend to discharge the firearm. He relies on *People v. Villanueva* (2008) 169 Cal.App.4th 41, in which the trial court told the jury as much. (*Id.* at p. 54.) The appellate court in *Villanueva* did not sanction the trial court's language; nor do we. Adding the word "specifically" to the instruction does not change what intent must be proven, i.e., that defendant intended to pull the trigger.

The instructions taken as a whole properly defined the mental element of the intentional discharge enhancement. The court's reply defined the mens rea element for the enhancement as "the defendant intended to discharge the firearm." This was the definition already given to the jury through the standard instruction on the enhancement, CALCRIM No. 3148. The court's reply also referred the jury to CALCRIM No. 252 (union of act and intent) and CALCRIM No. 3146. Taken together, the court's response to the jury question instructed the jury to apply the correct mens rea element required for

---

[4] We reject the argument in defendant's reply brief that the enhancement does require a further consequence -- causing great bodily injury -- and thus, requires a specific intent. Defendant seemingly overlooks the rule that specific intent provisions require the commission of the act with *the intent* to do a further act or achieve a future consequence. For example, if the statutory language in question here provided for an enhancement when the defendant personally and intentionally discharges a firearm *with the intent* to cause great bodily injury or death, then the enhancement would require specific intent.

10

the enhancement allegation and helped the jury determine the issue central to the enhancement -- whether defendant intended to pull the trigger.

### III. Ineffective Assistance of Trial Counsel Claim

Defendant contends trial counsel was ineffective in failing to request a pinpoint instruction on the defense of accident with regard to the intentional discharge enhancement.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland's* high bar is never an easy task.' " (*Harrington v. Richter* (2011) ___ U.S. ___, ___ [178 L.Ed.2d 624, 642 (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. ___, ___ [176 L.Ed.2d 284, 297.)

To establish prejudice, "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, ___ U.S. at p. ___ [178 L.Ed.2d at p. 642].) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d 171, 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694; accord, *Ledesma*, *supra*, 43 Cal.3d at p. 218.)

Even assuming trial counsel should have requested the accident instruction, defendant has failed to show how he was prejudiced by counsel's failure to do so. The jury was instructed with CALCRIM No. 3148 that the People must prove beyond a reasonable doubt that defendant intentionally fired the shotgun. The accident instruction

11

offered no additional guidance on the issue that would have been helpful here.[5] The defense was able to, and did argue that the shotgun was fired accidentally rather than intentionally. The jury's true finding as to the section 12022.53, subdivision (d) firearm allegation necessarily means that the jury found the firearm was not accidentally discharged. The evidence on this issue was compelling.

The evidence suggesting that defendant accidentally fired the shotgun, on the other hand, was suspect. His statement to the detective that the gun discharged accidentally was made only after the detective suggested as much as an interrogation tactic. Defendant denied wielding the shotgun during the second robbery, yet the victim said the unarmed person had dreadlocks or twisties. That described Soders's hairstyle, not defendant's. Defendant claimed that neither he nor Soders knew the shotgun was loaded when it discharged and wounded Martinez. Yet, the evidence suggested defendant was familiar with shotguns. He had posed for a picture holding one and it was defendant who later took a shotgun from the apartment when he moved.

Defendant has failed to show a reasonable probability that he would have received a more favorable result had the accident instruction been given.

## DISPOSITION

The judgment is affirmed.

---

[5] CALCRIM No. 3404 reads in pertinent part as follows: "[The defendant is not guilty of _____ <insert crime[s]> if (he/she) acted [or failed to act] without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of _____ <insert crime[s]> unless you are convinced beyond a reasonable doubt that (he/she) acted with the required intent.]" Even if modified for the section 12022.53, subdivision (d) firearm enhancement, the instruction would tell the jury no more than what it had been told in other instructions – the People needed to prove defendant intentionally discharged the firearm beyond a reasonable doubt.

                                        MURRAY          , J.


We concur:


          BUTZ          , Acting P. J.


          DUARTE          , J.