Filed 9/8/14  P. v. Lopez CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOEY JESSE LOPEZ,<br><br>    Defendant and Appellant. | F065052<br><br>(Super. Ct. No. F09906875)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Heather MacKay, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Joey Jesse Lopez appeals from the judgment entered after a jury found him guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the allegation that he personally used a firearm in the commission of the offense (§ 12022.53, subd. (d)). Lopez admitted that he had served a prior prison term (§ 667.5, subd. (b)). The jury rejected Lopez's defense that he was legally insane at the time of the killing. The trial court sentenced Lopez to a total term of 51 years in state prison.

On appeal, Lopez contends the trial court erroneously admitted evidence of Lopez's gang membership and photographs of the victim's corpse. He also contends that, in the sanity phase of the trial, the prosecutor committed various instances of misconduct and that erroneous instructions were given. Finally, he claims cumulative error. We conclude no prejudicial error occurred and affirm the judgment.

## STATEMENT OF THE FACTS

Guilt Phase

On the evening of December 6, 2009, Lopez and his friend Christopher Gonzalez[2] were together drinking alcohol and using methamphetamine. The next morning, the two drove Gonzalez's uncle's truck to a friend's house to continue partying, but were unable to find the house. With Gonzales driving, Lopez began "acting crazy" and started shooting a nine-millimeter handgun out the window into the air. Lopez did not respond to anything Gonzalez said to him. Gonzalez said he had seen the gun before in his uncle's truck and assumed Lopez found it there, although he did not see him get the gun.

Gonzalez drove to a nearby gas station to use a payphone. Once there, Gonzalez walked toward the payphone while Lopez remained in the truck. When Gonzalez heard gunshots, he ran back to the truck and saw Lopez, gun in hand, running back to the truck

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     In a deal made with the prosecution, Gonzalez pled guilty to being an accessory to murder in this case.

2.

from a beer truck parked at the gas station. Gonzalez and Lopez jumped into the truck and drove away.[3] Although multiple police cars followed them, Lopez repeatedly told Gonzalez to keep driving.[4] After losing the police vehicles chasing them, the truck stopped due to tire damage and Gonzalez and Lopez got out and ran.

The body of Richard Hernandez, dressed in blue clothing, was located face down near a beer truck in the gas station parking lot. Three spent nine-millimeter shell casings and bullet fragments from Lopez's gun were found near the body. Hernandez had been shot three times, including two bullets that went through both lungs and his aorta, which caused his death. Officer Todd Frazier did not think Hernandez had any gang ties.

Four hours after the shooting, Lopez, wearing a hooded sweatshirt, knocked on Kathy Weber's door. He was crying and said he wanted help because the police were after him. Weber shut the door and called 911. Lopez's gun was found the following day in Weber's yard, partially buried, loaded with four live rounds of ammunition.

Law enforcement officers found Lopez, matching the description given by Weber, in an alley near Weber's residence. He identified himself as a Bulldog gang member. Lopez, sobbing and gasping for air, said he was having problems with his family. The officers took Lopez to police headquarters. As they passed the murder scene, Lopez cried profusely, made grunting noises, and stomped his feet in the patrol car.

In interviews with law enforcement officers, Lopez admitted that he had gotten drunk the night before, but claimed he did not know anything about the murder, nor did he know the victim or Gonzalez.[5] Lopez told the officers he first tried to fit in to be a Bulldog when he was about 12 years old. He had multiple tattoos associated with the Bulldog gang, including a dog paw on his upper right cheek, a dog paw on his stomach,

---

[3]     Video surveillance from the store capturing the incident was played for the jury.

[4]     Video from a police vehicle during the chase was played for the jury.

[5]     The interviews were recorded, transcribed, and played for the jury.

"Fresno" on his chest, and a dog collar with a dog tag around his neck. According to Lopez, ever since he started smoking crack when he was 13 or 14 years old, he had "twisted thoughts" "to go kill scraps," a derogatory term used by Bulldog gang members to describe rival gang members. Lopez said the first person to give him crack was a "scrap," and voices in his head told him to kill Hernandez and "handle [his] business." But Lopez continued to maintain that he was not there when Hernandez was killed.

Lopez presented no defense.

Sanity Phase

    *1. Defense*

On December 4, 2009, just days before the shooting, Lopez's mother called the police because Lopez was "going crazy" and might kill himself. Lopez's mother told dispatch that she thought Lopez was high on methamphetamine. Paramedics were called to transport Lopez to a hospital. Because he was so upset and angry, he had to be put on a gurney in four-point restraints for safety reasons. Lopez admitted girlfriend and family issues, but denied having hallucinations and delusions. Lopez was diagnosed with alcohol intoxication.

On December 6, 2009, the day before the incident, Lopez was seen walking through the neighborhood barking, screaming, kicking, cussing, and flailing his arms. When police arrived, Lopez ignored them until they called him by name. Lopez was again transported to the hospital in restraints. His vital signs were consistent with "possible sympathomimetic stimulant use," although he denied any alcohol or drug use. A paramedic thought Lopez was hearing voices. Lopez was released six hours before the shooting.

Lopez's girlfriend, Nicole Reyes, testified that Lopez needed "a lot of psychiatric help." Lopez often got upset and angry because he heard voices in his head, maybe four times a week. He also got upset and angry that Reyes might leave him, which she did for a few weeks in November and December of 2009.

Lopez's family members explained that Lopez was seriously injured in a car accident as a small child. His behavior began to change when he tried to become a gang member while in middle school. Lopez was struck in the head with pieces of asphalt when he was jumped by a gang, but he did not receive any medical attention for the injuries. Lopez began exhibiting bizarre behavior when he was 17 or 18; he fought with his brothers for no apparent reason; he called girls on the telephone and told them the police were after him; he claimed to hear voices in his head; and he always thought the mailman was a policeman coming to get him.

Both Lopez's girlfriend and brother testified that Lopez smoked marijuana but denied he had done other drugs, although a former girlfriend said he had used methamphetamine. He mentioned suicide to his mother and father, but not to the others.

Dr. Harold Seymour, a clinical psychologist, was retained by the defense to conduct a sanity evaluation of Lopez. Dr. Seymour examined Lopez for two hours on November 29, 2011, almost two years after the shooting, and reviewed his psychiatric history and previous evaluations. Because there was evidence of prior psychotic episodes dating back almost 11 years, Dr. Seymour did not assess Lopez to determine whether he was malingering. Based on his review of police reports and interviews, his own interview with Lopez, and psychiatric records, Dr. Seymour opined that Lopez understood what he was doing at the time of the shooting but lacked the ability to distinguish between right and wrong and was, therefore, legally insane. In Dr. Seymour's view, Lopez determined something was wrong when police began to follow them while fleeing the scene.

Dr. Seymour diagnosed Lopez with bipolar disorder, type 1, mixed with hallucinations as psychotic features; with personality disorder, not otherwise specified, with some traits associated with antisocial personality disorder; and as having a history of polysubstance dependence, although he could not say if Lopez was under the influence at the time of the shooting. In Dr. Seymour's view, Lopez's inability to distinguish right

5.

from wrong was caused by the "psychosis inherent in the bipolar disorder" and not the personality disorder. Nor did he think drugs or alcohol were the likely cause of the killing. When asked, Dr. Seymour agreed that a person cannot be found insane due to a personality disorder.

According to Dr. Seymour, Lopez had been enrolled in a drug treatment program in May of 2003 and had not had access to illegal substances for months when he reported experiencing hallucinations. He received antipsychotic medication, which he claimed was helping with the voices. But Dr. Seymour acknowledged that Lopez had said that, after leaving the drug treatment program, he again began using street drugs and the voices became stronger. Dr. Seymour also acknowledged that delusions and auditory hallucinations are the easiest type of symptoms to malinger.

Dr. Laura Geiger, a psychologist, was also retained by the defense to conduct a sanity evaluation of Lopez, which she did in July of 2011. Dr. Geiger diagnosed Lopez with schizoaffective disorder, depressive type; as having a personality disorder, with borderline and narcissistic and antisocial features; and with adult antisocial behavior. Dr. Geiger explained that the usual age of onset for a psychotic break begins around the age of 19 or 20.

Dr. Geiger opined that Lopez's actions had been in response to command hallucinations. She thought the prosecution's expert's description of Lopez's auditory hallucinations as likely not "real" was inaccurate, because it did not take into account previous examples of Lopez responding to internal stimuli.[6] Dr. Geiger tested Lopez "in part" for malingering, but did not do every available test because there did not seem to be evidence in the psychological material, interviews, record or tests to support a diagnosis

---

[6]     Due to a scheduling conflict, Dr. Geiger testified after the expert for the prosecution.

of malingering. Instead, Dr. Geiger noted that Lopez exhibited "a very strong motivation to not want to appear mentally ill."

On cross-examination, Dr. Geiger could not rule out the possibility that some of Lopez's behavior in December of 2009, including the shooting, was the result of alcohol intoxication.

### 2. *The People's Case*

Dr. Luis Velosa, a psychiatrist, was appointed by the trial court to conduct a sanity evaluation of Lopez. Dr. Velosa interviewed Lopez in August of 2010 after reviewing police reports and interviews, interviews with Lopez's parents, video evidence of the shooting, medical records, and other evidence relating to the case. Dr. Velosa did not detect any evidence of bizarre, disorganized, or psychotic behavior during his examination of Lopez. Although Lopez claimed he heard voices, Dr. Velosa believed they were not auditory hallucinations but simply internal dialogue, explaining that the nature of the voices was not irrational or out of context with reality. Lopez acknowledged that the voices he heard were not real but that he had conversations with them back and forth in his mind. Lopez told Dr. Velosa that his girlfriend had left him and he had been kicked out of his house shortly before the shooting; he did not mention hearing voices when he described those events.

Dr. Velosa repeatedly opined that, at the time of the offense, Lopez knew what he was doing, knew that what he was doing was wrong, was able to differentiate right from wrong, and was not psychotic. Dr. Velosa did not think Lopez was suffering from any type of mental disease or defect at the time of the shooting and that he was sane at the time. Instead, he diagnosed Lopez with polysubstance drug dependence because of his addiction to methamphetamine and cocaine, but that the problem was in remission because he had not used illegal drugs for some time.

Former probation officer Cathy Doyden interviewed Lopez in 2004 to prepare a sentencing report on an unrelated matter. During that interview, Lopez stated he suffered

7.

from depression, diagnosed in 2003, that stemmed from issues he had with his son's mother. He did not indicate any other psychotic or mental health issues. Lopez was particularly proud of the tattoos he had. Lopez admitted drinking alcohol once or twice a month since age 13 and smoking two blunts of marijuana a day since age 11. Lopez liked to use LSD, acid, and Ecstasy in combination, but he denied any cocaine use. Lopez admitted taking methamphetamine once or twice, but did not like it because it made him "flip out."

## DISCUSSION

### I. DID THE TRIAL COURT PREJUDICIALLY ERR IN ALLOWING GANG EVIDENCE?

Lopez contends that the trial court abused its discretion in admitting prejudicial gang evidence. He contends the evidence should have been excluded, or at least strictly limited, because it was of low probative value, unnecessarily cumulative and highly prejudicial. Specifically, Lopez objects to the detailed photographs and testimony about his various gang tattoos, as well as the general testimony about Hispanic gangs. Lopez further asserts that admission of the evidence resulted in a fundamentally unfair trial. We find no prejudicial error.

*Background*

Before trial, the prosecutor asked to present 26 photos of Lopez's gang tattoos. The prosecutor wished to introduce the photos in the guilt phase, but was willing to wait and introduce the photos during the sanity phase to show that, because of his gang affiliation, Lopez's "moral standards are different than those generally accepted in our own community." The prosecutor also noted the psychological experts considered the photos in their evaluations and that Lopez's Bulldog affiliation provided an explanation for why he was barking at people the night before the shooting, negating the idea that he had "mental issues."

8.

Defense counsel objected to the photos, arguing they were not necessary because he intended to admit that Lopez was a Bulldog and that Bulldog members sometimes bark, and because the jury could plainly see the tattoos on Lopez's hands, face and neck. Defense counsel thought delaying admission of the photos until the sanity phase "would almost be worse … because it carries perhaps more impact." Defense counsel asserted the photos would add nothing of relevance and that displaying them would serve only to prejudice the jury.

The trial court overruled defense counsel's objection and issued a tentative ruling, finding that the photos appeared probative on issues for the sanity phase.

During the guilt phase of trial, defense counsel elicited from both Officer Richard Badilla, who arrested Lopez, and Detective Frazier that Lopez had admitted he was a Bulldog. The prosecutor played the recorded interview in which Lopez told police he began trying to join the Bulldogs at age 12. During that interview, Lopez also said his "twisted thoughts" "were fuckin' tellin' [him] to go kill scraps." Detective Frazier testified that "scraps" is a derogatory term used by Bulldog gang members to describe rival southern gang members.

The prosecution then asked Detective Frazier if Lopez had any tattoos and whether photographs were taken of the tattoos. Detective Frazier testified that Exhibits 56 through 81 were accurate photographs of Lopez's tattoos. The prosecutor asked that the photos be moved into evidence and published. Defense counsel stated, "That is agreeable, at this time."[7]

---

[7] The record is not clear at this point when and if the trial court changed its tentative ruling and allowed the photos into evidence in the guilt phase. Later, during the discussion on jury instructions, the trial court noted that the tattoo photos had been offered in the guilt phase, defense counsel had not objected, and that the trial court assumed the issue had been "discussed … and understood." Noting no reasoning had been placed on the record, the trial court stated it "allowed that information in … because

9.

Detective Frazier then commented on the admitted photos as follows: The tattoo of a dog paw on Lopez's upper right cheek, in Exhibit 57, was a common identifier of Bulldog gang members. Exhibit 59 showed Lopez's exposed chest and arms. Exhibit 60, showed a dog paw on Lopez's stomach, along with "BDS," meaning Bulldogs. Exhibit 61, showed Lopez's chest, neck, and arms with tattoos showing Bulldog affiliation, including the word "Fresno" on his chest and a dog collar around Lopez's neck.

Defense counsel objected, pursuant to Evidence Code section 352, to any additional tattoo photographs as being an undue consumption of time. The prosecutor agreed to withdraw 11 of the remaining tattoo photographs.[8]

When court resumed the following day, the prosecutor questioned Detective Frazier on the additional tattoo photos that had not been withdrawn. Detective Frazier testified that Exhibit 65 was another picture of the dog paw on Lopez's face; Exhibits 67 and 68 showed various tattoos of Bulldogs on Lopez's upper arm; Exhibit 69 was a right forearm tattoo showing the word "Pleasant," which stood for the Pleasant Street faction of the Northside Bulldogs; Exhibit 71 was a left arm tattoo of the letters "NFS," meaning Northside Fresno; Exhibit 73 showed a demon head on Lopez's upper left arm; Exhibit 74 depicted the eyes and teeth of a Bulldog and the letters "MNTL" on Lopez's left hand and wrist; and Exhibits 75 and 76, which showed additional tattoos on Lopez's left arm.

According to Detective Frazier, putting a gang tattoo on one's face, where it is seen by all, is a sign of commitment to a gang. Detective Frazier testified that the "more hard core" a gang member, the more tattoos he is likely to have. Detective Frazier described Lopez as "like a walking billboard for the Bulldogs."

the Court felt it did deal with the issue of motive based upon the Court's review of the recorded statement of Mr. Lopez."

[8] The photos not shown were Exhibits 62-64, 66, 70, 72, 77-81.

Detective Frazier testified generally that there are Northern and Southern Hispanic gangs in California, and that the Bulldogs used to be Northerners, but have separated off into their own group. He testified that Bulldogs and Nortenos, who wear red, continue to be rivals of Southerners, who wear blue. Bulldogs "bark" to let other people know who they represent. On cross-examination, Detective Frazier admitted that there was no evidence the victim Hernandez was a gang member.

The trial court subsequently instructed the jury with CALCRIM No. 1403 as follows:

> " … [Y]ou may consider evidence of gang membership only for the limited purpose of deciding whether: The defendant had a motive to commit the crime charged. [¶] You may not consider this evidence for any other purpose.… [Y]ou may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

During closing, the prosecutor argued Lopez made a premeditated and deliberate decision to kill Hernandez because he was wearing a blue work uniform.

During the sanity phase of the trial, the prosecutor continued to emphasize Lopez's Bulldog membership. After paramedic Arturo Carreon testified that Lopez was not wearing a shirt on December 4, when he was transported to the hospital, the prosecutor showed Carreon a photo of Lopez's chest and arms (EXH. 51) and asked whether the tattoos looked familiar. The prosecutor did the same when paramedic Byron Diel testified that Lopez was bare-chested on December 6, when he was again transported to the hospital. Diel testified that he had heard Bulldog members bark in the past and he would be scared if a heavily-tattooed man was walking around barking. And former probation officer Doyden said she remembered Lopez because he was proud of his Bulldog collar and other tattoos.

On cross-examination, Dr. Seymour testified that he had seen Lopez's tattoos before rendering his evaluation, but he did not know "specifically" what the extensive tattooing signified for a criminal street gang member. Dr. Seymour did not think the fact that Hernandez was wearing blue had any significance, because, had Lopez been sane at the time of the shooting, he would have recognized Hernandez as a truck driver wearing a uniform, not a Sureno.

In closing during the sanity phase, the prosecutor argued that Lopez's motive for the shooting was to kill a "scrap."

*Applicable Law and Analysis*

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) "In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation - including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like - can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050.) Specifically, "[g]ang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.) In a sanity proceeding, a history of conduct, past as well as present, is an important

12.

consideration in an appraisal of mental status.  (*People v. Houser* (1965) 238 Cal.App.2d 930, 933.)

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Evidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative.  (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)

"'[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations].  Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) if, broadly stated, it poses an intolerable "risk of the fairness of the proceedings or the reliability of the outcome."  [Citation.]'  [Citation.]"  (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.'  [Citation.]"  (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)  "Nonetheless, even if the evidence is found to be relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury.  [Citations.]"  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224 (*Albarran*).)

"The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.  [Citation.]"  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.)  In assessing prejudice, we must remember that "[t]he prejudice which exclusion of evidence under

13.

Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues … [it] is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Furthermore:

"To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is … whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*Albarran, supra,* 149 Cal.App.4th at pp. 229-230, fn. omitted.)

Lopez contends that the gang evidence, particularly the extensive photos of his gang tattoos and the police officer's testimony about the Bulldogs was irrelevant and cumulative because there was no evidence Lopez killed Hernandez for any reason related to Lopez's Bulldog affiliation. Lopez argues the trial court's admission of the gang evidence violated rules of evidence and prejudiced the verdict under state law, and also that the erroneous admission of this evidence was so serious as to violate his federal constitutional rights to due process, rendering his trial fundamentally unfair.

In support of his argument, Lopez relies on *Albarran, supra,* 149 Cal.App.4th 214, in which the appellate court found the admission of gang evidence violated due process, rendering the trial fundamentally unfair. (*Id.* at p. 232.) In *Albarran,* the defendant was charged with multiple offenses based on his participation in a shooting at the victim's home. He was not charged with the gang substantive offense, but gang enhancements were alleged. (*Id.* at p. 217.) The trial court permitted the prosecution to introduce gang evidence to prove the defendant's motive and intent. The jury convicted the defendant of the substantive offenses and found the gang enhancements true. Thereafter, the court granted a motion to dismiss the gang allegation for insufficient evidence. (*Ibid.*)

*Albarran* held that, while the trial court may have initially found the defendant's gang activities were relevant and probative to his motive and intent, the court abused its discretion when it permitted the prosecution to introduce additional gang evidence that was completely irrelevant to the defendant's motive or the substantive criminal charges. (*Albarran, supra,* 149 Cal.App.4th at pp. 226-228, 230.) The irrelevant evidence included other gang members' threats to kill police officers, lengthy descriptions of crimes committed by other gang members, and references to the Mexican Mafia prison gang. *Albarran* characterized the irrelevant gang evidence as "extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues." (*Id.* at pp. 227, 230, fns. omitted.) *Albarran* also classified this evidence as "overkill," and said it was "troubled" by the trial court's failure to scrutinize the potential prejudice of the gang offense on the substantive charges. (*Id.* at p. 228, fn. omitted.) *Albarran* found the irrelevant and prejudicial gang evidence so inflammatory it "had no legitimate purpose in this trial" and held its admission violated the defendant's due process rights. (*Id.* at pp. 230-231.)

Here, the gang evidence was properly admitted during the guilt phase on the issue of motive, providing the missing link between what could appear to be an otherwise random shooting and Lopez's statements to officers. The prosecution's theory was that

15.

Lopez killed Hernandez because he was wearing blue, the color of Lopez's rival gang, and the killing was the result of Lopez's premeditation and deliberation to kill rival gang members. Lopez admitted to law enforcement that he killed Hernandez because the voices in his head were telling him to "go kill scraps" and "handle [his] business." As noted by the trial court, the evidence of Lopez's gang membership was necessary to give the jury a proper understanding of Lopez's statements, since a layperson would not understand what it meant to kill "scraps" and handle his business. The prosecution did not argue that the shooting was in any way sanctioned by or for the benefit of the gang.

The extent of Lopez's gang tattoos tended to show his level of commitment to the gang, which in turn strengthened the prosecution's theory of Lopez's motive to kill Hernandez. When someone adorns one's body with tattoos, especially to the extent of the tattoos in this case, it demonstrates what can be argued to be a certain degree of allegiance, loyalty, and commitment to a particular group or organization. This commitment relates directly to issues of motive in this case.

The gang evidence was also properly admitted during the sanity phase to show Lopez was sane at the time of the killing and that he acted pursuant to his Bulldog commitment.

Even if we were to assume error for the admission of excessive photographs, for the sake of argument, Lopez has not demonstrated prejudice under either *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), or under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (See *People v. Boyette* (2002) 29 Cal.4th 381, 428 [*Watson* standard applied to prejudicial error analysis for errors of state law, while beyond-a-reasonable-doubt standard of *Chapman* applies to similar analysis for federal constitutional errors such as deprivation of due process].)

The evidence against Lopez was overwhelming. He was caught on video getting out of the truck, looking around, shooting Hernandez and then running back to the truck. He admitted he was a gang member and that he wanted to kill "scraps." There was also

16.

solid evidence of Lopez's sanity. Given the nature and amount of gang evidence at issue, relative to the other evidence presented at trial, we are convinced under either the state or federal standards of prejudicial error that reversal is unwarranted.

## II. DID THE TRIAL COURT PREJUDICIALLY ERR IN ALLOWING PHOTOGRAPHS OF THE VICTIM?

Lopez contends that the trial court abused its discretion in admitting a number of prejudicial photos of the victim Hernandez during the guilt phase. Lopez also asserts that admission of the evidence resulted in a fundamentally unfair trial. We find no prejudicial error.

*Background*

During in limine motions, the prosecutor sought to admit 20 photos of Hernandez's corpse at the scene of the shooting (EXHS. 25-44). Defense counsel objected that the photos were more prejudicial than probative. After discussion, the prosecutor withdrew 11 of the photos (EXHS. 26, 28-29, 31-33, 35-37, 39-40). In addition, defense counsel withdrew his objection to five photos that showed Hernandez's gunshot wounds cleansed of blood (EXHS. 41-44), conceding that these photos could be relevant to Lopez's mental state, showing that he was able to fire the gun accurately. Defense counsel also stated that he did not object to photos of the corpse covered in a tarp, to show the location where Hernandez was killed. This left five photos in dispute - exhibits 25, 27, 30, 34, and 38. The trial court concluded all five disputed photos were admissible, finding they were not unduly prejudicial because they were "not much different than what basically is shown on television." The trial court further determined the photos relevant to prove that Hernandez was killed, the circumstances of his death, and whether the murder was deliberate or premeditated.

Discussion was then had concerning eight autopsy photos the prosecution wished to admit (EXHS. 94-101). The prosecutor stated the photos would assist the medical examiner in testifying about Hernandez's wounds. The prosecutor also thought it

important that the jury understood Lopez shot Hernandez three times.  Defense counsel objected that the photos were irrelevant because the cause of death was undisputed and that they were more prejudicial than probative.  The trial court allowed the autopsy photos to be admitted, opining that they were relevant to the coroner's testimony and were not unduly prejudicial because they showed little blood.

At trial, the five disputed photos showing Hernandez's body taken at the crime scene were admitted and Detective Frazier testified that they showed Hernandez's body lying face down by the delivery truck.  The disputed autopsy photos were admitted during the testimony of medical examiner, Dr. Gopal, who testified that the photos showed fatal wounds to Hernandez's back and chest caused by three bullets.

*Applicable Law and Analysis*

"The admission of photographs of the victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.]  The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 133-134.)  But it is also true, as stated previously, that the trial court has no discretion to admit irrelevant evidence. (Evid. Code, § 350; *People v. Turner* (1984) 37 Cal.3d 302, 321, disapproved on another point in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149-1150.)

Lopez contends that the photos were irrelevant, since there was no dispute that he shot Hernandez three times in the back and that the bullet wounds were the cause of death.  It is true that, when "'a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence … to prove that element to the jury.'  [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 323 (*Poggi*).)  In *Poggi,* one photo at issue depicted the victim alive with her husband and son on Christmas and the other was an autopsy photo depicting the incisions made during a tracheotomy in an attempt to save the victim's life but not depicting any of

18.

the wounds the victim sustained during her attack. (*Id.* at pp. 322-323.) The manner of killing was not relevant in *Poggi*, and the photos were merely introduced for identification purposes. (*Ibid.*)

But here, while Lopez admitted killing Hernandez, the question of intent and deliberation was at issue, which the prosecutor hoped to show by the fact that Lopez got out of the truck with a loaded gun, approached Hernandez near the back of the delivery truck and shot him three times. Also at issue was Lopez's sanity, which the prosecutor hoped to show in part by his ability to successfully and accurately fire the gun in the manner intended.

We cannot say, after looking at the exhibits in question, that the evidence was unduly gruesome. While there was blood shown in some of the photos of Hernandez's body lying on the ground, it was not so pervasive as to unnecessarily evoke undue emotional bias. And the autopsy photos admitted showed very little, if any, bodily fluids or blood. The more graphic autopsy photos showing more blood, the peeling back of Hernandez's skull, the removal of Hernandez's brain, and the upper cavity of his skull were not admitted.

Under the facts of this case, even if it was error to admit the photos, the error was not prejudicial. As we have observed, the evidence against Lopez was overwhelming. We conclude no prejudicial error occurred under either *Watson* or even under the more stringent *Chapman* standard. (*Watson, supra,* 46 Cal.2d at p. 836; *Chapman, supra,* 386 U.S. at p. 24.)

III. DID THE PROSECUTOR COMMIT MISCONDUCT DURING THE SANITY PHASE OF TRIAL?

Lopez contends the judgment in the sanity phase of his trial must be reversed because the prosecutor engaged in misconduct during cross-examination and closing argument. We find no merit to his claim.

*Background*

Lopez first contends the prosecutor committed misconduct during cross-examination and closing by urging the jury to conclude that Lopez's not guilty by reason of insanity (NGI) plea was evidence of malingering.

On cross-examination, the prosecutor asked defense expert Dr. Geiger how she reconciled her testimony that Lopez did not want to appear to be mentally ill with the fact that Lopez had entered an NGI plea. Dr. Geiger responded:

> " … I think you can reconcile it because someone has an underlying dynamic of, in general, not wanting to appear as crazy or sick or mentally ill. It doesn't necessarily mean that they're foolish when it comes to being involved in a life-changing legal situation. And I don't actually know the mechanics of what happened or what transpired between Mr. Lopez and his counsel, as far as how he got to that plea.… [¶] … [¶] The fact that he said it personally doesn't negate his dynamic, his underlying dynamic that he doesn't want to be seen as mentally ill on a day-to-day basis."

When asked if this was "another situation or another circumstance where [Lopez] is using his mental illness to his advantage," Geiger stated, "Possibly," but then noted various test results that indicated Lopez was not trying to appear mentally ill.

In closing, the prosecutor argued that Lopez's tendency to tell the testifying witnesses that he heard voices was inconsistent with the idea that he did not want to appear mentally ill. The prosecutor also argued that Lopez consistently used mental illness to manipulate people, just like the defense in this case.

Lopez also contends the prosecutor committed misconduct during closing argument by "acting as his own psychiatric expert, diagnosing Lopez as a 'malingerer' with no support in the evidence."

During the sanity phase, defense expert Dr. Seymour testified that he did not suspect Lopez was malingering, given that he had a long documented history of psychiatric problems, he complained to family and friends about hearing voices when he

had no motive to lie, and he was reluctant to tell the police that he was hearing voices for fear that the officers would think he was crazy.

On cross-examination by the prosecutor, Dr. Seymour acknowledged that he had not administered a test for malingering even though delusions and auditory hallucinations are symptoms most commonly and easily faked. The prosecutor recited a list of four diagnostic criteria for malingering from the DSM-IV[9]: being referred by an attorney; marked discrepancy between a person's claimed stress or disability and the objective findings; lack of cooperation during the diagnostic evaluation and non-compliance with the prescribed treatment regimen; and the presence of an antisocial personality disorder. Dr. Seymour agreed that the diagnostic criteria mentioned by the prosecutor were accurate, that Lopez had been referred to him by an attorney, that Lopez had traits of antisocial personality disorder, and that Lopez had shown noncompliance with prescribed treatment at the jail. But Dr. Seymour did not agree that Lopez fit the definition of a malingerer.

Defense expert Dr. Geiger testified that she considered the possibility that Lopez was malingering to avoid criminal consequences, but found her testing of him was consistent with actual mental illness. She also did not administer any specific malingering test. Instead, she found that Lopez did his best to downplay his mental problems and had a significant ability to mask his illness.

On cross-examination, the prosecutor went through the same DSM-IV criteria for malingering with Dr. Geiger, who also admitted Lopez had been referred to her by an attorney, had given some invalid responses to questions, had been uncooperative on one

---

[9]     DSM-IV refers to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, fourth addition. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1241.)

occasion, and had exhibited noncompliance with prescribed treatment at the jail. But she too did not think specific testing for malingering was warranted.

The parties subsequently stipulated that, "on July 20th 2010, the defendant agreed that his plea in this case would be not guilty by reason of insanity." During closing, defense counsel explained to the jury that, although a defendant must personally enter an insanity plea, his lawyer advises the defendant on what to do.

The prosecutor, in closing, criticized Dr. Geiger and Dr. Seymour for failing to test Lopez for malingering, and argued, "You have plenty of evidence that the defendant has a motive to get himself out of trouble to the extent he can," and that Lopez had a history of claims of mental illness "as a manipulation" "[j]ust like he did in this case." The prosecutor again mentioned the DSM-IV criteria, argued that three of the criteria had been met and that "we could probably make a case for the fourth one," and that Lopez "actually fits the criteria for malingering. Absolutely."

*Applicable Law*

1. *Not Guilty by Reason of Insanity Plea*

"Under California law, if a defendant pleads not guilty and joins it with a plea of not guilty by reason of insanity, the issues of guilt and sanity are tried separately. Penal Code section 1026, subdivision (a), provides that in such circumstances, 'the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court. In that trial, the jury shall return a verdict either that the defendant was sane at the time the offense was committed or was insane at the time the offense was committed.'" (*People v. Hernandez* (2000) 22 Cal.4th 512, 520-521.)

"The 'sanity trial is but a part of the same criminal proceeding as the guilt phase' [citation] but differs procedurally from the guilt phase of trial 'in that the issue is confined to sanity and the burden is upon the defendant to prove by a preponderance of the evidence that he was insane at the time of the offense' [citation].  As in the determination of guilt, the verdict of the jury must be unanimous.  [Citation.]" (*Ibid.*)

   2.  *Prosecutorial Misconduct*

"'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.]  Under state law, a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial.  [Citation.]' [Citations.]" (*People v. Salcido* (2008) 44 Cal.4th 93, 152, italics omitted.)

"'"[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom."'" (*People v. Welch* (1999) 20 Cal.4th 701, 752.)  But a prosecutor "may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed." (*People v. Visciotti* (1992) 2 Cal.4th 1, 52.)  And "[t]o prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]  In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"In general, '"a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion - and on the same ground - the defendant [requested] an assignment of misconduct and [also] requested that the jury be

admonished to disregard the impropriety.'"' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1184-1185.)

The People contend Lopez forfeited his prosecutorial misconduct argument by failing to raise objection in the trial court, when objections and admonitions would have cured the alleged harms. Lopez concedes he did not object. For the sake of judicial efficiency, we will address the merits of Lopez's prosecutorial misconduct contentions. (*People v. Ochoa* (1998) 19 Cal.4th 353, 428.) By doing so, we avoid an unnecessary analysis of whether he received ineffective assistance of counsel, which he argues in the alternative. (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1179.)

*Analysis*

Lopez objects to the prosecutor's line of questioning during cross-examination about Lopez's NGI plea, claiming it is misconduct for a prosecutor to comment on the exercise of a defendant's legal right. While this is true (e.g., a prosecutor may not comment on a defendant's right to remain silent and not testify (*Griffin v. California* (1965) 380 U.S. 609, 611-615)), "[a]n insanity plea is not the assertion of a 'right.'" (*People v. Hernandez, supra,* 22 Cal.4th at p. 523.) Instead, insanity is a "special plea to the effect that … the defendant … is not amenable to punishment under the law," and the defendant has the burden of proving the defense by a preponderance of the evidence. (*Id.* at pp. 521, 522.)

Lopez analogizes the prosecutor's argument to the blatant misconduct described in a sanity trial in *People v. Sorenson* (1964) 231 Cal.App.2d 88 (*Sorenson*). The analogy fails. In *Sorenson*, the defendant entered a plea of not guilty by reason of insanity to charges that he had written three bad checks. (*Id.* at p. 90.) He had a history of writing bad checks. (*Ibid.*) In closing, the prosecutor argued: "'[W]e get caught and we tried this other road before, and it doesn't work so now let's have a new plea, let's try something different, nothing worked before, let's try a plea of insanity this time. "If I am going to be confined for anything at all, let's make it some time in the hospital instead of jail." If the

doctor feels he is not in one of these states of being manic depressive this particular minute, this turns him loose.'" (*Id.* at p. 91.)

The *Sorenson* court found the argument "obvious misconduct" for several reasons:

"Defendant's immediate or ultimate destination - whether state hospital, state prison or to be 'turned loose' - was a judgment which the law reposed in other hands than the jury's. [Fn omitted.] The Prosecutor's statement was a thinly disguised appeal to the jurors to abdicate their lawful role and to decide the issue of sanity in terms of their own opinion that imprisonment, not hospitalization, was defendant's proper fate. In effect, the district attorney was urging the jury to usurp functions reposed by statute in other hands. The statement was an appeal to prejudice, an attempt to arouse aversion toward a verdict which might 'turn him loose' to victimize innocent people with more bad checks. Finally, the argument misstated the law, telling the jury that after defendant's commitment to a state hospital, 'the doctor' could release him. Penal Code sections 1026 and 1026a, to the contrary, prevent the release of a defendant without a judicial hearing and a finding of restoration to sanity." (*Sorenson, supra,* 231 Cal.App.2d at pp. 91-92.)

The court found the misconduct to be prejudicial, noting the only medical evidence was presented by the defendant and "[a]though not compelling, that evidence strongly tended to support a verdict of legal insanity." The court also noted there had been no admonition to the jury, making it likely the "impropriety" of the prosecutor materially influenced the verdict. (*Id.* at pp. 93-94.)

Here, it was not misconduct for the prosecutor to impeach Dr. Geiger's claim that Lopez did not want to appear mentally ill. A prosecutor has wide latitude to test the credibility of an expert witness on cross-examination so that the jury may determine the weight to be given the testimony. (*People v. Ryan* (1956) 140 Cal.App.2d 412, 421.) Lopez's presentation of an insanity defense, and the evidence he presented, contradicted Dr. Geiger's opinion that Lopez tried not to appear mentally ill, a fact the prosecutor took advantage of. It was not misconduct for the prosecutor to emphasize Lopez's tendency not to hide any mental illness and that he used it to manipulate those around him.

25.

Lopez also contends the prosecutor committed misconduct because he, in essence, told the jury in closing that, based on specialized knowledge and expertise on his part, Lopez had been diagnosed as a malingerer. It is true that a prosecutor, serving as his own unsworn witness, is beyond the reach of cross-examination in violation of a defendant's right to confront all witnesses against him. (*People v. Bolton* (1979) 23 Cal.3d 208, 214-215, fn. 4.)

But here, the prosecutor never claimed that Lopez had been diagnosed as a malingerer, nor did he present his argument under a false cover of scientific authority that he had proved Lopez was malingering based on the malingering criteria alone. Instead, the prosecutor argued that defense experts' opinions were flawed because they had failed to test Lopez for malingering, even though he fit several of the criteria that should have lead an evaluator to strongly suspect such.

In any event, even if we were to find the complained of questioning on cross-examination and argument during closing error, it was not prejudicial on either state or federal grounds. While defense counsel presented expert testimony supporting the claim of insanity, the prosecutor presented expert testimony refuting that claim. It is the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence. (*People v. Alcala* (1984) 36 Cal.3d 604, 623, disapproved on other grounds by *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) The trial court properly instructed the jury on the proper manner to evaluate expert witness testimony. (CALCRIM No. 332.) In addition, the jury was instructed that "[n]othing that the attorneys say is evidence," and that evidence consists of the testimony of witnesses. (CALCRIM No. 222.) We presume the jury followed this instruction, giving the prosecutor's remarks little significance. (*People v. Boyette, supra,* 29 Cal.4th at p. 453; *People v. Morales* (2001) 25 Cal.4th 34, 47.)

IV. DID CALCRIM NO. 3450 VIOLATE SECTION 25 OR LOPEZ'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO PRESENT A DEFENSE?

Lopez contends that CALCRIM No. 3450 as given was inconsistent with the legal test for insanity, violating section 25 and his constitutional rights to due process and to present a defense. We disagree.

We note first that Lopez never objected to CALRIM No. 3450 on several of the grounds he now raises. Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party requested appropriate clarifying or amplifying language. (*People v. Lang* (1989) 49 Cal.3d 991, 1024; *People v. Hart* (1999) 20 Cal.4th 546, 622.) Lopez contends, while no objection was made, none was necessary because the instruction issue affects his substantial rights. (§ 1259; see, e.g., *People v. Harris* (1981) 28 Cal.3d 935, 956.) We will address the issue without deciding whether an objection should have been made.

*Section 25 and CALCRIM No. 3450*

As noted earlier, "Insanity, under California law, means that at the time the offense was committed, the defendant was incapable of knowing or understanding the nature of his act or of distinguishing right from wrong." (*People v. Hernandez, supra,* 22 Cal.4th at pp. 520-521.) The statutory definition of insanity is provided in section 25, subdivision (b), which provides, in relevant part:

> "In any criminal proceeding, … in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."

CALCRIM 3450, the pattern instruction defining the burden of proof and the legal standards for assessing sanity, as given and pertinent to the discussion here, instructed that Lopez was insane if:

27.

"One, when he committed the crime, he had a mental disease or defect; [¶] *And two, because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong.* [¶] … [¶] You may find that at times the defendant was legally sane and at other times he was legally insane. You must determine whether he was legally insane when he committed the crime." (Italics added.)

*Applicable Law and Analysis*

Appellate courts determine de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) "'"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole … [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.]" (*Ibid.*) "'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid.*)

Lopez contends that CALCRIM No. 3450 as given was faulty because it did not set forth the proper test for insanity, or that "[a]t the very least, it was confusing and misleading." Specifically, Lopez claims that the italicized portion of the instruction was incorrect because it lacked "reference to the time of the offense," implying that if a defendant "could possibly have known his act was morally wrong under any circumstances, then he is not legally insane." We disagree.

"[T]he thrust of CALCRIM No. 3450 is to inform the jury that the burden is on the defendant to prove he was insane at the time of the offense[]. This is consistent with section 25, subdivision (b)." (*People v. Thomas* (2007) 156 Cal.App.4th 304, 310.) While the challenged paragraph of the pattern instruction, when viewed in isolation, may be potentially misleading, when read in context, it certainly is not. The first prong in

28.

assessing sanity stated Lopez was legally insane if, "when he committed the crime, he had a mental disease or defect," thus expressly stating that the only relevant time period for the mental disease or defect was at the time of the offense. The second prong then references the first prong by starting, "because of that disease or defect …," necessarily referencing the relevant time period. Thus, while the phrase "when he committed the crime" did not appear in the second prong of the test itself, it clearly related to that specific time period. Moreover, the complete instruction, as given, plainly states no less than seven times that to find Lopez insane it had to find him so at the time he committed the offense.

Viewing the instruction as a whole, there is no "reasonable likelihood" the jury understood the instructions as Lopez asserts. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) We reject his contention to the contrary. Because we do so, we need not address his further argument that the instruction, as it pertained to the definition of insanity, violated his due process rights or his right to present a defense.

## V. DID CALCRIM NO. 3450 VIOLATE SECTION 29.8 OR LOPEZ'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO PRESENT A DEFENSE?

Lopez also contends that CALCRIM No. 3450, as given, did not accurately reflect the law set forth in section 29.8, violating his constitutional rights to due process and to present a defense. We disagree.

### Section 29.8 and CALCRIM No. 3450

Section 29.8 provides, in relevant part:

> "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances.…"

29.

In other words, the defense of legal insanity can never be proven, as a matter of law, when the only mental disease or defect is a personality disorder.  (*People v. Cabonce* (2009) 169 Cal.App.4th 1421, 1436.)

The jury was instructed on this concept in part of CALCRIM No. 3450 as follows:

"None of the following qualify as a mental disease or defect for purposes of an insanity defense:  personality disorder, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts.  [¶]  If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity.  A settled mental disease or defect is one that remains after the effect of the drugs or intoxicants has worn off."

*Applicable Law and Analysis*

Lopez contends that the instruction as given was flawed for several reasons.  First, he contends that CALCRIM No. 3450 is defective because it does not tell the jurors that they cannot find insanity "solely on the basis of personality disorder," as provided in section 29.8.  Instead, Lopez argues that, in a case like his where he has multiple diagnoses, the instruction prohibits the jury from considering whether he was insane due to the effect of a personality disorder in combination with some other non-exempted mental illness.  We disagree.

To recap, defense expert Dr. Geiger opined that Lopez had a schizoaffective disorder with various sub-components, as well as a personality disorder, not otherwise specified, with borderline narcissistic and antisocial features.  Defense expert Dr. Seymour diagnosed Lopez with a bipolar disorder with psychotic features and a personality disorder not otherwise specified, with borderline and antisocial features.  He also found Lopez had a history of polysubstance dependence, but could not say if he was under the influence at the time of the crime.  Court-appointed expert Dr. Velosa

30.

diagnosed Lopez with polysubstance drug dependence, which was now in remission. No mention was made by Dr. Velosa of Lopez having a personality disorder.

Lopez cites the predecessor CALJIC instruction which, he argues, did not contain the error he claims exists in CALCRIM No. 3450. That instruction, CALJIC No. 4.00, states, in pertinent part: "this defense of legal insanity does not apply when the *sole or only basis or causative factor* for the mental disease or mental defense is [a personality or adjustment disorder] [a seizure disorder] [, or] [an addition to, or an abuse of, intoxicating substances].]" (Italics added.)

We find Lopez's contention contrary to the plain language of the instruction as given. While the statement may be improved upon, the CALCRIM instruction did not preclude the jury from considering a bipolar or schizoaffective disorder in tandem with a personality disorder in deciding whether Lopez was insane at the time of the murder. Not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is "'whether the ailing instruction … so infected the entire trial that the resulting conviction violates due process.'" [Citations.]" (*Estelle v. McGuire, supra,* 502 U.S. at p. 72.) When read in context, as we must, the instruction states that the jury could find Lopez legally insane if it found he had a mental disease or defect; that because of the disease or defect he was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong; and that, in making that determination, a personality disorder did not qualify as a mental disease or defect. (CALCRIM No. 3450.)

Furthermore, we note that, in his testimony, Dr. Seymour specifically stated that Lopez's inability to distinguish right from wrong was caused by his "psychosis inherent in the bipolar disorder" and not his personality disorder. And, when asked, Dr. Seymour agreed that a person cannot be found insane due to a personality disorder.

31.

We reject Lopez's claim that the instruction, as given, was inaccurate.

Lopez also asserts the trial court erred in instructing the jury based on section 29.8 because it did not apply to the evidence and therefore undermined his ability to present a defense. According to Lopez, his insanity defense was not based solely on evidence that he had a personality disorder, but also on evidence he suffered from psychotic disorders.

We find Lopez's reliance on *People v. Robinson* (1999) 72 Cal.App.4th 421, misplaced. There, the appellate court concluded the trial court should not have given a special instruction based on section 25.5 (the predecessor to section 29.8) because neither the prosecutor nor the defendant relied on the defendant's "long-term substance abuse and possible resulting mental damage or disorder as the sole cause of his insanity." (*Robinson, supra,* at pp. 423, 428.) But here the prosecution's theory was that Lopez did not suffer from any psychotic disorder, and if he did suffer from any mental illness, it was only a personality disorder. The instruction was therefore applicable under the evidence presented and argued by the prosecution and we reject Lopez's argument to the contrary.

Finally, Lopez argues the exclusion of personality disorders from the definition of insanity for the purpose of the legal defense under section 29.8 is unconstitutional. The crux of Lopez's argument is that section 29.8 precludes an insanity defense based on a personality disorder even if that disorder renders a person legally insane under the provision of section 25, which states, in relevant part, that a person may be found not guilty by reason of insanity "only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).)

Lopez's argument is without merit. When read together, sections 25 and 29.8 are not inconsistent. Rather, section 29.8 serves to specify the disorders that cannot, by the legislature's evaluation, cause a person to be "incapable of knowing or understanding the

32.

nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."  (§ 25, subd. (b).)

The limitation of that which qualifies as legal insanity under section 29.8 is entirely within the state legislature's discretion, and is not unconstitutional.  (see, e.g., *Clark v. Arizona* (2006) 548 U.S. 735, 752, fn. 11 ["[T]he jurisdictions limit, in varying degrees, which sorts of mental illness or defect can give rise to a successful insanity defense.  Compare, e.g., Ariz. Rev. Stat. Ann. § 13-502(A) (West 2001) (excluding from definition of 'mental disease or defect' acute voluntary intoxication, withdrawal from alcohol or drugs, character defects, psychosexual disorders, and impulse control disorders) with, e.g., Ind. Code § 35-41-3-6(b) (West 2004) (excluding from definition of 'mental disease or defect' 'abnormality manifested only by repeated unlawful or antisocial conduct')."])

## VI.  DID THE TRIAL COURT PROPERLY DENY LOPEZ'S REQUEST TO MODIFY CALCRIM NO. 3450 ON THE CONSEQUENCES OF AN INSANITY DEFENSE, THEREBY VIOLATING HIS RIGHT TO DUE PROCESS?

Lopez makes one final argument concerning CALCRIM No. 3450:  the trial court erroneously refused to give a modification suggested by defense counsel that would have accurately informed the jury about the effects of an insanity verdict.  Lopez claims that the resulting instruction improperly permitted the jurors to speculate about whether they would endanger public safety by finding Lopez insane.  We disagree.

*Procedural Background*

At the outset of the sanity phase of the trial, the trial court expressed its intent to instruct the jury with CALCRIM No. 3450 prior to the opening statements by counsel. CALCRIM No. 3450 includes the following optional paragraph:

> "[If you find the defendant was legally insane at the time of (his/her) crime[s], (he/she) will not be released from custody until a court finds (he/she) qualifies for release under California law.  Until that time (he/she) will remain in a mental hospital or outpatient treatment program, if

33.

appropriate. (*He/she) may not, generally, be kept in a mental hospital or outpatient program longer than the maximum sentence available for (his/her) crime[s]. If the state requests additional confinement beyond the maximum sentence, the defendant will be entitled to a new sanity trial before a new jury.* Your job is only to decide whether the defendant was legally sane or insane at the time of the crime[s]. You must not speculate as to whether (he/she) is currently sane or may be found sane in the future. You must not let any consideration about where the defendant may be confined, or for how long, affect your decision in any way.]" (CALCRIM No. 3450 (Oct. 2010 rev., italics added.)

Defense counsel requested that the italicized portion of the instruction be deleted, arguing that it would mislead the jury by incorrectly suggesting that Lopez's sentence would be anything less than a life sentence. Defense counsel suggested that the trial court replace the two sentences with the statement, "He may or may not be kept in a mental hospital or outpatient program for the rest of his life." The trial court noted it was not given any authority for the proposed change or that the instruction, as written, was an incorrect statement of the law. The trial court gave defense counsel time to research the issue and present authority. In the meantime, the trial court agreed, with concurrence from both the prosecutor and defense counsel, not to include the above referenced paragraph when it pre-instructed the jury with the CALCRIM No. 3450. The instruction was given without this paragraph prior to opening statements by counsel.

At a jury instruction conference during the sanity phase, the trial court readdressed the issue. Defense counsel reiterated his request to delete the two challenged sentences. The trial court noted that, according to the bench notes on the instruction, the paragraph need not be given sua sponte but may be given on request. Defense counsel requested that the paragraph be given, minus the complained of sentences. The trial court denied defense counsel's request, stating that it would either give the entire paragraph as written or not give it at all, because it "[did not] make it a habit to kind of cut and paste from one section and delete wholesale sentences like that."

After some discussion, defense counsel conceded that CALJIC No. 4.01 contained "the same problem of referring to a maximum sentence that in this case doesn't exist." When finally faced with the choice to give the paragraph in the instruction in its entirety or omit it entirely, defense counsel chose to omit the paragraph in CALCRIM No. 3450. He also declined to have the jury instructed with CALJIC No. 4.01 instead. But defense counsel then requested the last paragraph of CALJIC No. 4.01 be substituted for the objected portion of CALCRIM No. 3450. Defense wished to use the wording of CALJIC No. 4.01, which states:

> "It is a violation of your duty as jurors if you find the defendant sane at the time he committed his offense because of a doubt that the Department of Mental Health or the courts will properly carry out their responsibilities."

The trial court again ruled that it would not give the paragraph at issue and was not inclined to make any modifications to it, such as adding language from CALJIC No. 4.01.

The jury was subsequently again instructed prior to closing argument with CALCRIM No. 3450, sans the contested paragraph. Following closing argument and after further discussion about defense counsel's original request, the trial court instructed pursuant to CALCRIM No. 3550, in relevant part, "You must reach your verdict without any consideration of punishment."

*Applicable Law and Analysis*

Lopez now argues that the trial court erred by refusing to modify the instruction as requested, and that not doing so was prejudicial because the jury may have found him sane simply due to concerns he would be released early if the jury found he was insane. We disagree.

Lopez's argument is based on *People v. Moore* (1985) 166 Cal.App.3d 540 (*Moore*), which held that whenever requested by the defendant or jury, the trial court should give an appropriate instruction regarding the consequences of an insanity verdict

to ensure the jury does not erroneously believe such a verdict will result in the immediate freeing of the defendant. (*Id.* at pp. 554, 556.)

"California law originally did not provide" for the type of instruction contemplated by *Moore*. (*People v. Kelly* (1992) 1 Cal.4th 495, 538.) As a result of *Moore*, however, CALJIC No. 4.01 was drafted in response and it was "intended to aid the defense by telling the jury not to find the defendant sane out of concern that otherwise he would be improperly released from custody." (*Kelly, supra,* at p. 538.) The instruction's intent is to "protect the defense" in an insanity trial. (*Ibid.*)

CALCRIM No. 3450 is the successor instruction to CALJIC No. 4.01.[10] CALCRIM No. 3450, like its predecessor, is designed to protect a defendant in an

---

[10] CALJIC No. 4.01 provides, in its entirety: "A verdict of 'not guilty by reason of insanity' does not mean the defendant will be released from custody. Instead, [he] [she] will remain in confinement while the courts determine whether [he] [she] has fully recovered [his] [her] sanity. If [he] [she] has not, [he] [she] will be placed in a hospital for the mentally disordered or other facility, or in outpatient treatment, depending upon the seriousness of [his] [her] present mental illness. [¶] Moreover, [he] [she] cannot be removed from that placement unless and until the court determines and finds the defendant's sanity has been fully restored, in accordance with the law of California, or until the defendant has been confined for a period equal to the maximum period of imprisonment which could have been imposed had [he] [she] been found guilty. [¶] So that you will have no misunderstandings relating to a verdict of not guilty by reason of insanity, you have been informed as to the general scheme of our mental health laws relating to a defendant, insane at the time of [his] [her] crimes. What happens to the defendant under these laws is not to be considered by you in determining whether the defendant was sane or insane at the time [he] [she] committed [his] [her] crime[s]. Do not speculate as to if, or when, the defendant will be found sane. [¶] You are not to decide whether the defendant is now sane. You are to decide only whether the defendant was sane at the time [he] [she] committed [his] [her] crime[s]. If upon consideration of the evidence, you believe defendant was insane at the time [he] [she] committed [his] [her] crime[s], you must assume that those officials charged with the operation of our mental health system will perform their duty in a correct and responsible manner, and that they will not release this defendant unless [he] [she] can be safely returned into society. [¶] It is a violation of your duty as jurors if you find the defendant sane at the time [he] [she] committed [his] [her] offense[s] because of a doubt that the Department of Mental Health or the courts will properly carry out their responsibilities."

36.

insanity trial by alleviating the possible fears of the jury that he will be released into the community if he is found not guilty by reason of insanity. (*People v. Kelly, supra,* 1 Cal.4th at p. 538.) The paragraph at issue in CALCRIM No. 3540 is not limited to the two sentences to which Lopez objected. Instead, the instruction advises the jury of several important facts: if the defendant is found insane, he will not be released from custody until a court finds he qualifies for release under state law and, until that time, he will remain in the appropriate treatment facility. The instruction concludes with the important admonition: "You must not let any consideration about where the defendant may be confined, or for how long, affect your decision in any way." (CALCRIM No. 3450.)

Both the paragraph with the contested language from CALCRIM No. 3450 and CALJIC No. 4.01 are to be given if requested by the defense. (*People v. Dennis* (1985) 169 Cal.App.3d 1135, 1140-1141.) Defense counsel was asked several times whether he wished to include the contested paragraph from CALRIM No. 3450 and was also asked if he wished to have the jury instructed instead with CALJIC No. 4.01 in its entirety. Defense counsel declined in each instance. Either one of these instructions would have adequately addressed defense counsel's concerns, and we reject his claim to the contrary.

We note also that the jury was eventually instructed following argument by counsel, pursuant to CALCRIM No. 3550, that it must reach its verdict without any consideration of punishment. Absent evidence to the contrary, we presume the jurors followed the court's instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

VII.    CUMULATIVE ERROR

Finally, Lopez contends that the cumulative impact of all of the above errors deprived him of a fair trial. We have either rejected Lopez's claims of error and/or found that any errors, assumed or not, were not prejudicial. Viewed cumulatively, we find that any errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

## DISPOSITION

The judgment is affirmed.

_____
Franson, J.

WE CONCUR:


_____
Hill, P.J.


_____
Cornell, J.